UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **Houston Pilots** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| vs. | § | **Civil Action No.** |
| | § | |
| | § | **FED. R. CIV. P. 9(h) – Admiralty** |
| **Galveston-Texas City Pilots and** | § | |
| **GalTex Pilots Service Corporation,** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**
**And REQUEST FOR DECLARATORY JUDGMENT**

Plaintiff, Houston Pilots, file its Original Complaint and Request for Declaratory Judgment against the Galveston-Texas City Pilots and Galveston Pilots Service Corporation, and would show the court the following:

### I.   PARTIES

#### A. Plaintiff

1. Plaintiff, Houston Pilots, is an unincorporated association ship pilots with its principal place of business in Harris County, Texas.

#### B. Defendants

2. Defendant Galveston-Texas City Pilots Association ("the Galveston Pilots") is an unincorporated association of ship pilots with its principal place of business at 1301 Pennzoil Rd, Galveston, TX 77554.  The Galveston Pilots do not have a registered agent for service of process. Therefore, pursuant to Federal Rules of Civil Procedure 4(e)(1) and 4(h), and Texas Revised Civil Statute art. 6134, the Galveston Pilots may be served by registered mail sent to its President/Presiding Officer, Ryan Malcolm, at GalTex Pilots Service Corporation.

1

3. Defendant GalTex Pilots Service Corporation ("GalTex Corporation") is a Texas corporation with its principal place of business in Galveston, Texas. GalTex Corporation's registered agent for service of process is Erik B. Stramblad, who may be service via certified mail at GalTex Pilots Service Corporation, 1301 Pennzoil Road, Galveston, TX 77554

## II.   JURISDICTION & VENUE

4. This is an admiralty and maritime claim within the jurisdiction of the United States and this Honorable Court pursuant to Article III, Section 2 of the United States Constitution, 28 U.S.C. § 1333(1), 46 U.S.C.A. § 30101 and Rule 9(h) of the Federal Rules of Civil Procedure.

5. Additionally, pursuant to 28 U.S.C. § 1367 and relevant case law, this Court has pendent and/or ancillary jurisdiction over any non-maritime claims, if any, in this Original Complaint because they are so related to the maritime claims that they are part of the same case or controversy.[1]

6. Venue is proper in the Southern District of Texas, pursuant to 28 U.S.C. § 1391 because Defendants reside in this district and because a substantial portion of the events or omissions which form the basis of Plaintiff's claims occurred in this district.

## III.   FACTS

### A.   Background Information Regarding Plaintiff and Defendants

7. Plaintiff Houston Pilots is an unincorporated association of independent contractor ship pilots licensed by the federal and state governments to conduct pilotage services to, from and within the ports of Harris County, Texas and the Gulf of Mexico, including all waterways and intermediate stops in between. *See* 46 C.F.R. § 11, Subpart G, and Tex. Transp. Code § 66.

---

[1] In accordance with 28 U.S.C. § 1367, Plaintiff would show that the non-maritime claims in this Complaint, if any: (1) do not raise any novel or complex issues of state law; do not substantially predominates over the claim or claims over which this Court has original jurisdiction; the Court has not dismissed all claims over which it has original jurisdiction; and there are no other compelling reasons for declining supplemental jurisdiction.

8. Defendant Galveston-Texas City Pilots Association ("the Galveston Pilots") is an unincorporated association of independent contractor ship pilots licensed to conduct pilotage to, from and within the ports of Galveston County, Texas and the Gulf of Mexico, including all waterways and intermediate stops in between. *See* 46 C.F.R. § 11, Subpart G, and Tex. Transp. Code § 67.

9. The individual Galveston pilots are independent contractor ship pilots licensed to conduct pilotage to, from and within the ports of Galveston County, Texas and the Gulf of Mexico, including all waterways and intermediate stops in between. *See* 46 C.F.R. § 11, Subpart G, and Tex. Transp. Code § 67. These individuals collectively comprise the Galveston Pilots.

10. Defendant GalTex Pilots Service Corporation ("GalTex Corporation") is, based on information and belief, a service corporation which is owned by the individual Galveston pilots who comprise the Galveston Pilots. GalTex Corporation runs many of the day-to-day operations necessary for the Galveston Pilots to perform their job as ship pilots.

11. Based on information and belief, GalTex Corporation owns various assets, including but not limited to pilot boats, computer systems, communication equipment, billing software, and other tangible assets necessary for the Galveston Pilots to perform their job as ship pilots.

12. Based on information and belief, GalTex Corporation employs numerous individuals such as dispatchers who interact with local shipping agents to arrange for Galveston Pilot services, crews for the Galveston Pilots' pilot boats, individuals who bill and collect revenue for the services of the individual pilots, etc.

### B. Pilotage in the Bolivar Roads Anchorage

13. Bolivar Roads is the strip of water enclosed by the North and South jetties between Galveston Island and Bolivar Peninsula.[2]



14. This protected water is used as a temporary anchorage location for ships heading to both Houston and Galveston. "Bolivar Roads Anchorage serves as a critical maritime waypoint for vessels entering or leaving the Port of Galveston, the Houston Ship Channel, and other surrounding Gulf Coast ports."[3]

15. Vessels anchor in Bolivar Road to wait for a berth to become available, for bad weather to pass, to load bunkers and other provisions, to undergo necessary inspections, etc.[4]

---

[2] https://www.tshaonline.org/handbook/entries/bolivar-roads
[3] https://ports.marinelink.com/ports/port/bolivar-roads-anch
[4] *See, e.g.*, https://lonestarhsc.org/dir/wp-content/uploads/2020/01/Mariner-Guide-Navigating-the-Houston-Galveston-Area-Waterways-LSHSC-12.2.2020.pdf, at p. 16.

### C. The History of Pilotage Fees for Ships Anchoring in Bolivar Roads

16. For over 100 years, the Houston Pilots and Galveston Pilots have shared the waterway/ship channel from the sea buoy in the Gulf of Mexico and through Bolivar Roads up to Texas City.

17. The two pilot groups have also shared the duties of anchoring ships in the Bolivar Roads Anchorage, as determined by the intended destination of the ship.

18. For most of the past 100+ years, when a ship bound for a Harris County port under the direction of a Houston Pilot first made an intermediate stop, and anchored in Bolivar Roads, and then changed its destination and proceeded from anchor to a Galveston County port, the Houston Pilots released the pilotage fee paid for the anchoring in Bolivar Roads to the Galveston Pilots.

19. Conversely, when a ship bound for a Galveston County port under the direction of a Galveston Pilot first made an intermediate stop and anchored in Bolivar Roads, but later changed its destination and proceeded to a Harris County port, the Galveston Pilots released the pilotage fee for the anchoring in Bolivar to the Houston Pilots.[5]

20. The practice of one pilot group releasing Bolivar Roads anchorage fees to the other group when the ship changes its final destination is referred to as a "retroactive correction" of pilot fees.

21. This "retroactive correction" pilotage fee procedure based upon a ship's actual final destination upon leaving the Bolivar Roads anchorage has worked well since the 1920s.[6]

22. Although the retroactive correction billing procedure was practical and effective, it created cumbersome accounting issues. In approximately 2020, the leadership of the Galveston Pilots

---

[5] When a ship proceeded from sea to the Bolivar Roads Anchorage, and then from the anchorage back to sea without going to a port in either in Harris or Galveston Counties and one or both anchoring jobs was done by a Houston Pilot, Houston Pilots released the pilotage fee to the Galveston Pilots.

[6] The final destination reasoning is based upon the fact that a ship which ultimately proceeds to Houston benefits the commerce of Houston and, therefore, the Houston Pilots should earn the pilotage fees, and vice versa for Galveston.

approached the leadership of the Houston Pilots and proposed that the retroactive correction billing procedure be changed.

23. The Galveston Pilots proposed that whichever group piloted a ship into or out of the Bolivar Roads Anchorage, that group would keep the pilotage fees.

24. Although this new agreement was financially advantageous to Defendants, and financially detrimental to the Houston Pilots, the Houston Pilots knew that the Galveston Pilots had been experiencing financial difficulties because of the number of ships calling in Galveston had declined.

25. Therefore, the leadership of the Houston Pilots accepted the new billing agreement to assist their Galveston colleagues.

26. Although the new billing arrangement was used for a period of time, the individual Houston Pilots never formally ratified the new agreement.

27. In early 2025, a motion to approve the new arrangement was voted on by the membership of the Houston Pilots. Unfortunately, motion failed.

28. Therefore, in February 2025, the Presiding officer of the Houston Pilots advised Captain Malcolm, the Presiding Officer of the Galveston Pilots, that "the Houston Pilots will revert the retroactive [billing] procedure…"[7]

29. It is important to note that this new arrangement *did not* change final destination method of determining which pilot group was entitled to pilot a ship into or out of the Bolivar Roads Anchorage, which had been in effect for over one-hundred years.

30. The Defendants' position is not only legally incorrect, it is impracticable and would be burdensome and expensive to ship owners.

---

[7] *See* Exhibit 1, letter to Captain Malcolm, which is fully incorporated by reference herein.

31. If Houston Pilots were not authorized to pilot ships in and out of the Bolivar Roads Anchorage, a ship in the anchorage which wanted to go to a Harris County Port would have to hire a Galveston pilot to take the ship offshore and then hire a Houston Pilot to bring the ship back past the Bolivar Roads Anchorage to the Harris County Port.

32. The final destination method is based upon the relevant pilotage statutes, case law interpreting the statutes and the historical practice of both pilot groups.

      **D.**    **Galveston Pilots Now Wrongfully Claim Houston Pilots are not Legally Authorized to Handle Jobs in Bolivar Roads.**

33. Apparently unhappy with loss of revenue which the Galveston Pilots would incur by reverting to the historical retroactive correction billing procedure, on April 11, 2025, the Galveston Pilots sent a letter to various "Industry Partners" in which the Galveston Pilots falsely claim:[8]

> *Houston Pilots are not legally authorized under the Texas Transportation Code to handle jobs in Bolivar Roads*...
>
> Only pilots licensed by the Board of Pilot Commissioners for Galveston County are authorized to conduct jobs into ports with Galveston County, including Bolivar Roads…
>
> … we are informing all users of Bolivar Roads that we are the only pilot association authorized to conduct jobs in this area…
>
> …we felt it important to make you aware of this ongoing discrepancy, in which the Houston Pilots appear to be taking advantage of at [sic] significant cost to industry.
>
> … kindly inform your ship agents that all Bolivar Roads jobs should be ordered using a Galveston Texas City Pilot.

---

[8] *See* Exhibit 2, which is fully incorporate by reference herein (emphasis added). Although this letter was signed by Ryan Malcom, Presiding Officer, Galveston-Texas City Pilots. However, based on information and belief, the letter was sent on behalf of all members of the Galveston Pilots.

34. Based on information and belief, Defendants have also made theses verifiably false claims to numerous other members of the maritime industry, causing great, and unnecessary, concern in the industry.

35. Such false claims included statements that Houston Pilots are not authorized to pilot ships into or out of the Bolivar Roads Anchorage.

36. At the time Defendants made these statements, Defendants' statements were false and/or misleading. The new position being taken by the Galveston Pilots not only flies in the face of over one hundred years of practice, it contradicts the express holding of the applicable statutes and case law, all of which are well known to all defendants.

37. The Houston Pilots are subject to regulation by the Board of Pilot Commissioners for Harris County Ports ("the Harris County Pilot Board"). Section 66.015 of the Texas Transportation Code states:

> The [Harris County Pilot Board] has exclusive jurisdiction over the regulation of pilots who provide pilot services in **Harris County ports, including intermediate stops and landing places for vessels on navigable streams wholly or partially located in the board's jurisdiction.**[9]

38. Chapter 66 also defines "Harris County Port:"

> Section 66.002(3): "Harris County port" means a place in Harris County into which a vessel enters or from which a vessel departs **and the waterway leading to that place from the Gulf of Mexico.**[10]

39. As early as 1921, the courts have recognized that the Harris County Pilot Board's jurisdiction included Bolivar Roads:

> Plaintiffs are residents of the city of Houston, and each of them is **a duly qualified and licensed pilot**… **having been appointed to the office of pilot by the Board of Pilot Commissioners for the inland waterway extending from the city of Houston to <u>Bolivar Roads</u> and the Gulf of Mexico**, appointed by the Governor of Texas in 1919.[11]

---

[9] Tex. Transp. Code § 66.015 (emphasis added).
[10] Tex. Transp. Code § 66.002(3) (emphasis added).
[11] *O'Brien v. Ammerman*, 233 S.W.2d 1016, 1016 (Tex. App.—Galveston, 1921) (emphasis added).

8

40. In 1944, a Texas appellate court affirmed that the jurisdiction of the Harris County Pilot Board includes Bolivar Roads: "If a ship was bound for Houston, her pilotage fell under the jurisdiction of the pilot commissioners for Harris County Houston Ship Channel Navigation District."[12]

41. This same court also recognized that **Houston Pilots "were licensed to perform the mere act of pilotage into the Roads, dependent upon the ship's destination**."[13]

42. Twenty years later, the Fifth Circuit reaffirmed the <u>requirement</u> that "**vessels bound from sea or from anchorage in Bolivar Roads into a terminal or pier within the geographical confines of the [Harris County] Navigation District** as well as all vessels within the [Harris County] District bound for sea or another port <u>**must have a Houston pilot aboard**</u>."[14]

43. The courts have also addressed, and upheld, the historical course and conduct of the two groups that utilized the retroactive correction procedure for pilot fees for ships entering and leaving Bolivar Roads.

44. In addressing the retroactive correction procedure, the *Goodwin* court wrote:

> **There was nothing unlawful in such an arrangement**. If a ship was bound for Houston, her pilotage fell under the jurisdiction of the pilot commissioners for Harris County Houston Ship Channel Navigation District. But if it was not so bound, the pilotage of her did not fall within such jurisdiction, as will hereafter appear. The arrangement between the two sets of pilots therefore merely provided for a **retroactive correction to conform to the destination of the ship when it became known.**[15]

45. For over 100 years Defendants implicitly agreed that Houston Pilots were licensed and authorized to pilot ships into and out of the Bolivar Roads Anchorage.

---

[12] *Houston Pilots et al. v. Goodwin et al.,* 178 S.W.2d 308, 312 (Tex. App.—Galveston, 1944) (writ dism'd).
[13] *Id*. at 313 (emphasis added).
[14] *Steinhort v. Comm'r of Internal Revenue*, 335 F.2d 496 (5th Cir. 1964) (emphasis added).
[15] Goodwin, 178 S.W.2d at 312 (emphasis added).

9

46. In fact, pursuant to the Houston Pilots tariff, which is approved by Board of Pilot Commissioners for Harris County Ports, the Houston Pilots are authorized to provide, and charge for, pilot services into and out of the Bolivar Roads Anchorage.

### E. Defendants are Soliciting Pilot Jobs into and out of Bolivar Roads which Rightfully are Jobs for the Houston Pilots.

47. In another apparent attempt to increase the revenue for the Galveston Pilots, based on information and belief, the Galveston Pilots have and are taking ships out of the Bolivar Roads Anchorage to sea even when the ships have come from Houston and have merely made an intermediate stop in the Bolivar Roads Anchorage before proceeding to sea.

48. Also based on information and belief, the Galveston Pilots have and are taking ships into the Bolivar Roads Anchorage even when the ship is merely making an intermediate stop in the anchorage on the way to its ultimate destination in Houston.

49. Based on information and belief, the Galveston Pilots have been dispatched to these jobs by employees of Defendant Galtex Pilots Service Corporation.

50. Additionally, in another apparent attempt to create revenue, Defendant Galtex Pilots Service Corporation employees have recently advised ships and/or their representatives that the ship must vacate the Bolivar Roads Anchorage because Defendants are of the opinion a *federal rule* requires the ship to depart the anchorage.[16]

51. Based on Defendants' public assertion that Defendants are the only ones who can pilot ships out of the Bolivar Roads Anchorage, Defendants have effectively told such ships that they must hire a Galveston pilot to move the ship out of the Bolivar Roads Anchorage.

---

[16] Based on information and belief, this conduct by Defendants is new, despite the fact that the federal rule in question has been in effect for some time.

### IV.    CAUSES OF ACTION AND DAMAGES

52.   Plaintiff fully incorporates all of the above facts and legal authorities into this Section VI.

#### A.    Tortious Interference with Existing Business Relationships.[17]

53.   Plaintiff has had, and does have, existing business relationships with many ships, shipping companies and the representatives of a shipping companies who contract with Plaintiff for Plaintiff to perform pilotage services on the navigable waters of the Houston Ship channel, including to and from the Bolivar Roads Anchorage.

54.   Defendants have actual knowledge of these maritime contracts or have knowledge of the facts and circumstances that would lead Defendants to believe Plaintiff has such contracts.[18]

55.   These maritime contracts are not only subject to interference by Defendants, but Defendants have willfully and intentionally interfered with such contracts for pilotage services to and from the Bolivar Roads Anchorage and continue to do so.

56.   Defendants' interference with these contracts has proximately caused Plaintiff's injuries and Plaintiff's actual damages. Based on information and belief, Defendants have solicited and taken jobs to pilot ships into and/or out of the Bolivar Roads Anchorage, when such jobs rightfully belong to, and have historically belonged to, the Houston Pilots, which has caused Plaintiff actual damages.

57.   Defendants' actions have resulted in the Galveston pilots piloting deep draft ships on navigable waters and taking such ships to or from the Bolivar Road Anchorage, when such jobs lawfully belong to the Houston Pilots, which has caused Plaintiff actual damages.

58.   The actions occurred on navigable waters and involved traditional maritime activities.

---

[17] This Court has maritime jurisdiction over the maritime tort claims asserted in this Complaint because Defendants' interference satisfies both the requisite situs and status requirements for admiralty jurisdiction.

[18] These contract which are the basis of Plaintiff's claims are maritime contracts involving maritime services and traditional maritime activities.

59. Defendants' actions have interfered with Plaintiff's long-standing agreements with ship interests to board ships in Bolivar Roads and to pilot such vessels from Bolivar Roads to sea after having called on a Harris County Port, which has caused Plaintiff actual damages.

60. Defendants' actions have interfered with Plaintiff's long-standing agreements with ships coming from sea and heading to Bolivar Roads to board such ships at sea and then pilot such vessels to Bolivar Roads before calling on a Harris County Port, which has caused Plaintiff actual damages.

61. Defendants' actions have interfered with Plaintiff's long-standing agreements to board ships on the navigable waters of the Houston Ship Channel when such are leaving a Harris County Port and heading to an intermediate stop in Bolivar Roads Anchorage before heading to sea, which has caused Plaintiff actual damages.

62. Defendants' actions have prevented Houston Pilots from piloting ships to or from the Bolivar Roads Anchorage, which has caused Plaintiff actual damages.

63. Defendants' actions have prevented Houston Pilots from boarding and/or disembarking ships in the Bolivar Roads Anchorage, which has caused Plaintiff actual damages.

64. Plaintiff intends to seek all actual damages for the lost benefits of these contracts, as well as exemplary damages and all other damages to the furthest extent allowed by law.

### B. Tortious Interference with Prospective Business Relationships

65. There was a reasonable probability that Houston Pilots would have entered into a business relationship with ships, shipping companies and the representatives of a shipping companies to perform pilotage services to and from Bolivar Roads.

66. Defendants have intentionally interfered with these prospective business relationships/maritime contracts.

67. Defendants' conduct was independently tortious and/or unlawful and proximately caused Plaintiff's injury, which has caused Plaintiff to suffer actual loss and/or damages.

68. Based on the "Industry Partners" letter, and other direct contacts by Defendants with industry, upon information and belief there is reasonable probability Plaintiffs intend to solicit and take jobs to pilot ships into and/or out of the Bolivar Roads Anchorage, in situation where such jobs would rightfully belong to the Houston Pilots. Such actions will cause Plaintiff actual damages.

69. In reasonable probability, such actions will result in Galveston pilot boarding and/or disembarking ships on navigable waters and taking such ships to or from the Bolivar Road Anchorage, when such jobs lawfully belong to the Houston Pilots. Such actions will cause Plaintiff actual damages.

70. In reasonable probability, Defendants' actions will interfere with Plaintiff's long standing agreements with ships in Bolivar Roads Anchorage to board such ships and to pilot such ships from Bolivar Roads to sea after having called on a Harris County Port. Such actions will cause Plaintiff actual damages.

71. In reasonable probability, Defendants' actions will interfere with Plaintiff's long standing agreements with ships coming from sea to board such ships on navigable waters and pilot such vessels to Bolivar Roads before calling on a Harris County Port. Such actions will cause Plaintiff actual damages.

72. In reasonable probability, Defendants' actions will interfere with Plaintiff's long standing agreements to board ships on the navigable waters of the Houston ship channel when such are leaving a Harris County Port and heading to an intermediate stop in Bolivar Roads before heading to sea. Such actions will cause Plaintiff actual damages.

73. In reasonable probability, Defendants' actions will prevent Houston Pilots from piloting ships to or from the Bolivar Roads Anchorage, which will cause Plaintiff actual damages.

74. In reasonable probability, Defendants' actions will prevent Houston Pilots from boarding and/or disembarking ships in the Bolivar Roads Anchorage, which will cause Plaintiff actual damages.

75. Plaintiff intends to seek all actual damages for the lost benefits of these contracts, as well as exemplary damages and all other damages to the furthest extent allowed by law.

### C. Civil Conspiracy to Commit Tortious Interference with Existing and Prospective Business Relationships

76. Two or more of the Defendants were members of a conspiracy whose object was to accomplish an unlawful purpose or a lawful purpose by unlawful means, i.e., to tortiously interfere with Plaintiff's existing and/or prospective business relationships and their legal right to pilot ships in and out of Bolivar Roads Anchorage as described above.[19]

77. The members of this conspiracy had meeting of the mind on the object or course of action of the conspiracy, i.e., to tortiously interfere with Plaintiff's existing and/or prospective business relationships.

78. One of the members committed an unlawful, overt act to further the object or course of action, which included but is not limited to the Industry Partners letter in which the Galveston Pilots defamed the Houston Pilots.

79. Plaintiff fully incorporates the allegation in Section IV(B) and IV(C) above.

80. As a result of Defendants' actions, Plaintiff have suffered actual damages as outlined above, and which is fully incorporated herein.

---

[19] The allegations in the preceding sections concerning tortious inference with existing and prospective business relations are fully incorporated by reference into this section of the Complaint.

81. Because of the participation in this civil conspiracy, Defendant are jointly and severally for Plaintiff's damages related to the tortious interference with existing and prospective business relations.

### D. Breach of Contract

82. For over eighty years the Houston Pilots and the Galveston Pilots have had a maritime oral contract and/or implied contract regarding which jobs to and from the Bolivar Roads belong to which pilot group, and how to retroactively correct billing to the clients when the final destination of a ship changes after it arrives in the Bolivar Roads Anchorage.[20]

83. This contract satisfies all the requisite elements, including offer, acceptance and mutual consideration.[21]

84. The mutual consideration included, but is not necessarily limited to, the retroactive correction billing agreement by which the two pilot groups have released funds to the other group when the final destination of a ship is determined.

85. This oral contract has been validated by several courts in the intervening years.[22] Defendants have ratified this agreement by course of action perhaps thousands of times in the intervening years by accepting the agreement's terms of what jobs belong to which pilot group, and consistently accepting the retroactive correction billing procedure.

86. Defendants have now made clear they no longer intend to be bound by this contract, or be bound by the relevant case law and governing statutes.

---

[20] *See* discussion above in Section III. Also, see the discussion of the retroactive corrective procedure in *Houston Pilots et al. v. Goodwin et al.*, 178 S.W.2d 308 (Tex. App.—Galveston, 1944) (writ dism'd).

[21] *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 265 (5th Cir. 2011) ("[O]ral contracts are generally regarded as valid by maritime law.")

[22] *See, e.g., Houston Pilots et al. v. Goodwin et al.*, 178 S.W.2d 308 (Tex. App.—Galveston, 1944) (writ dism'd); *O'Brien v. Ammerman*, 233 S.W.2d 1016, 1016 (Tex. App.—Galveston, 1921); *Steinhort v. Comm'r of Internal Revenue*, 335 F.2d 496 (5th Cir. 1964).

87. Defendants have breached this contract and proximately caused the damages suffered by Plaintiff by asserting the Houston Pilots do not have authority to handle any pilot jobs into or out of the Bolivar Roads Anchorage.

88. Plaintiff seeks all damages allowed by law, to the fullest extent allowed by law, including actual damages, pre and post judgment interest, attorney's fees and court costs.

### E. Defamation

89. The letter from Defendants to Industry Partners, and the oral statements by Defendants, that the Houston Pilots have been piloting ships into and out of the Bolivar Roads Anchorage (and charging for such pilotage) when the Houston Pilots are not authorized to do so had defamed Plaintiff.

90. It is incontrovertible that Defendants' defamatory statements about Plaintiff have been published to multiple individuals and/or organizations.

91. The statements were and are false. Defendants acted with actual malice in doing so, or alternatively acted negligently.

92. The publication of these statements has caused Plaintiff actual harm including, but not limited to, by causing customers of the Houston Pilots to not hire a Houston pilot, but instead hire the services of a Galveston pilot.

93. Plaintiff would show that Defendant Galtex Pilots Service Corporation may be held liable for defaming Plaintiff because its employees were acting within their course and scope of employment when making defamatory statements regarding Plaintiff.

94. Defendant Ryan Malcolm is liable for defaming Plaintiff because of the statements he made in his letter to Industry Partners which he sent on or about April 11, 2025.

95. Plaintiff seeks all damages allowed by law, including general/direct damages (including but not limited to damage to Plaintiff's character or reputation), special damages (including but not limited to loss of past and future income and loss of employment benefits), court costs, and exemplary damages.

### F. Maritime Trespass

96. Defendants have willfully, intentionally, and/or negligently invaded the legal rights of Plaintiff to pilot vessels in and out of the Bolivar Roads Anchorage.

97. This marine trespass was without consent and proximately caused the damages sustained by Plaintiff.

98. Plaintiff seeks all damages allowable by law, at the highest rate allowed by law, including but not limited to exemplary damages for Defendant's intentional, willful and wanton misconduct, as authorized by the Supreme Court in cases of marine trespass and tort. *See Atlantic Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 411 (2009)(noting that "punitive damages are an available maritime remedy under the proper circumstances" and that "[o]ne of this Court's first cases indicating that punitive damages were available involved an action for marine trespass.")."

### G. Unjust Enrichment

99. Defendants' actions have unjustly enriched Defendant at the expense of Plaintiff.

100. Defendants have wrongfully secured the benefit of payment for pilotage services, and it would be unconscionable for Defendants to retain this benefit.

101. Plaintiff would show that Defendants obtained this unjust enrichment by means of fraud, duress, or the taking of an undue advantage.

102. Plaintiff seeks all damages allowed by law, at the highest rate allowed by law, including but not limited to restitution of the pilotage fees wrongfully paid to Defendants, attorney's fees, and court costs.

### H. Money Had and Received

103. Defendants hold money that in equity and good conscience belongs to Houston Pilots and has been unjustly enriched by its usurping of Houston Pilot's right to pilotage.

104. Defendants have failed to retroactively correct pilotage fees for pilotage services it has performed involving ship transits that benefitted the commerce of the of Harris County and/or that began or ended in that County.

105. This conduct was independently tortious and unlawful and proximately causes the damages sustained by Plaintiff.

### I. Declaratory Judgment

106. This case involves an actual controversy within this Court's jurisdiction. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, Houston Pilots also seeks a declaration from the Court with respect to the rights and other legal relations between the parties. Specifically, Houston Pilots requests that this Court declare that:

a. Houston Pilots has exclusive rights to pilotage for vessels whose transits benefit the commerce of Harris County, Texas and which begin or end in a Harris County port.

b. The Board of Pilot Commissioners of Harris County Ports has exclusive jurisdiction over the pilotage of ships to or from a Harris County port to the Gulf of Mexico, including all intermediate stops, anchorages, and landing places on the navigable waterway leading from a Harris County port to the Gulf of Mexico, pursuant to Chapter 66 of the Texas Transportation Code.

# V.
## PRAYER

107. Plaintiff, Houston Pilots, requests that all Defendants be cited to appear and answer, and that upon final trial Plaintiff has judgment against Defendants, jointly and severally for the following:

    i. legal damages, including all actual damages and special damages;

    ii. exemplary damages;

    iii. attorney fees;

    iv. pre-judgment interest on all damages at the highest rate allowed by law;

    v. post-judgment interest on all of the foregoing at the highest prevailing legal rate from judgment until paid

    vi. costs of Court;

    vii. a Declaratory Judgment that:

    (a)    the Houston Pilots has exclusive rights to pilotage for vessels whose transits benefit the commerce of Harris County, Texas and which begin or end in a Harris County port, as defined by Tex. Transp. Code § 66.002(3), and

    (b)    that the Board of Pilot Commissioners of Harris County Ports has exclusive jurisdiction over the pilotage of ships to or from a Harris County port to the Gulf of Mexico, including all intermediate stops, anchorages, and landing places on the navigable waterway leading from a Harris County port to the Gulf of Mexico, pursuant to Chapter 66 of the Texas Transportation Code.

    viii. any and all other relief to which Plaintiff is justly entitled.

Respectfully Submitted,

**Holman Fenwick Willan USA LLP**

<u>*/s/ Thomas N. Lightsey III*</u>
Thomas N. Lightsey III
Texas Bar No.: 12344010
Fed Id.: 84829
3040 Post Oak Blvd., Fl 18, Suite 129
Houston, Texas 77056
E-Mail: tom.lightsey@hfw.com
Telephone: (713) 917-0888
Direct dial: 713-706-1952
Facsimile: (713) 953-9470
**Attorney-in-Charge for Plaintiff, Houston Pilots**

**Of Counsel:**

**Holman Fenwick Willan USA LLP**
Christopher R. Hart
Texas Bar No. 09136310
Fed Id.: 12517
E-Mail: chris.hart@hfw.com
Gary E. English
Texas Bar No. 24086366
Fed Id.: 3585278
E-Mail: gary.english@hfw.com
3040 Post Oak Blvd., Fl 18, Suite 129
Houston, Texas 77056
Telephone: (713) 917-0888
Facsimile: (713) 953-9470

**Gillman & Allison, LLP**
Brenton Allison
Texas Bar: 24040417
Fed. Id. 36863
2005 Cullen Blvd.
Pearland, TX 77581
Telephone: 713-224-6622
Facsimile: (866) 543-3643